| | | |
|---|---|---|
| Matthew Allen Borisch, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-339** |
| | ) | |
| Malibu Boats, Inc., | ) | **JURY DEMAND** |
| Malibu Boats, LLC, and | ) | |
| Jack Springer, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Matthew Allen Borisch ("Plaintiff" or "Mr. Borisch"), files this Complaint against Defendants Malibu Boats, Inc. and Malibu Boats, LLC ("Malibu"), as well as Jack Springer ("Mr. Springer") (collectively, "Defendants") and states as follows:

### INTRODUCTION

1.      This is an action to hold Malibu, a publicly traded company, and its former Chief Executive Officer, Jack Springer, accountable for the damages they caused Mr. Borisch through their intentional and fraudulent scheme to artificially inflate Malibu's stock value and market share and, thus, artificially increase sales performance and profitability. The Defendants' scheme was directed towards Malibu's largest boat dealership network, collectively known as "Tommy's," and its owner, Mr. Borisch. In an effort to artificially inflate Malibu's stock value and market share in a struggling tow boat industry, Malibu and Springer engaged in an elaborate scheme to over manufacture nearly $100 million worth of its highest priced, highest margin, slower moving boat inventory and coerce 15 of Mr. Borisch's dealerships to purchase that inventory in order to

1

artificially inflate Malibu's sales performance, artificially claim increased market share in the industry, and artificially inflate its stock value during an obvious and known downturn in the recreational tow boat industry.

2.      For a 12-year period ending in 2023, Mr. Borisch was the "go to" person any time Malibu needed a struggling dealership to be taken over. By 2022, Mr. Borisch owned and operated 15 Malibu dealerships, which were responsible for more than 10% of Malibu's total sales volume for the year. Throughout this time period, the parties followed a consistent course of dealing. Each year, the parties entered into new dealership agreements, which typically expired annually during the summer months. The parties would then, every year, negotiate new dealership agreements that would not be finalized until months after the prior year's agreement had already expired. Nonetheless, the parties would continue to operate in good faith despite the gap between operative agreements.

3.      A critical component of the parties' ongoing relationship was Malibu's willingness to provide the lenders of Mr. Borisch's dealerships with a repurchase agreement regarding any unsold inventory the dealerships purchased from Malibu under a floor plan financing agreement, upon event of default. These repurchase agreements are standard in the industry, and Malibu consistently adhered to this practice for the 11 years prior to 2023. As described below, repurchase agreements would have required Malibu to take back unsold inventory, providing critical protection for both Tommy's and its lenders. In addition, Malibu committed each year to providing certain incentives and rebates if certain targets were met, while also paying back interest paid by Tommy's relating to its inventory of boats from Malibu. That all changed starting in 2022.

4.      In July 2022, Mr. Springer, flanked by Wayne Wilson, who was Malibu's Chief Financial Officer, began pressuring Mr. Borisch to commit to increasing the existing floor plan credit

2

capacity from $50 million to $160 million for his dealerships. By that time, Malibu, along with every other original equipment manufacturer ("OEM") in the tow boat industry, had already seen a substantial decrease in its year-over-year sales figures since the world began to return to "normal" following the COVID-19 Pandemic, but it withheld that information from Mr. Borisch. Instead, Malibu represented to Mr. Borisch that Tommy's would need the increase in floor plan capacity in order to keep up with demand and meet expectations relating to market share. When Mr. Borisch pushed back, both in the initial meeting and over the months that followed, Malibu made clear that its request was not optional, and that Mr. Borisch would lose his status as a Malibu dealer if he did not comply. Malibu also continued to misrepresent, through the end of 2022 and into 2023, that its own data supported its false claims of increasing demand, notwithstanding the fact that Malibu was already seeing a sharp downturn in sales and was expecting that downward trend to continue in 2023.

5. In the face of Malibu's and Mr. Springer's demands and threats, Mr. Borisch complied and arranged for substantial increases in Tommy's floor plan from $50 million to $85 million, initially, and then to $110 million with a $20 million overage limit. Immediately after that process was completed, Malibu began pumping inventory into Mr. Borisch's dealerships in order to artificially inflate its own numbers and increase its market share and stock price. The Defendants accomplished their scheme by coercing Mr. Borisch, through threats and misrepresentations, to accept a mix of boat models that heavily skewed toward the highest priced, highest margin, and slower moving Malibu boats rather than the more modestly priced, lower margin and faster moving Axis-branded boats that the dealerships had requested. The Defendants knew that the product mix that it was forcing Mr. Borisch to accept would likely leave Tommy's in a precarious financial position, or worse. Mr. Borisch acquiesced to their demands relating to

3

acceptance of new inventory based on Defendants' threats, misrepresentations regarding Malibu's purported projections for the year, and false assurances that Malibu would pay certain rebates and provide interest recovery, as it had in prior years. As it turns out, and unbeknownst to Mr. Borisch at the time, Defendants' representations were entirely false.

6.     By August 2023, Mr. Borisch's dealerships were in a dire financial position due to Defendants' fraudulent misconduct, putting Mr. Borisch individually at risk of losing tens of millions of dollars. When Mr. Borisch asked the Defendants to step in and help, they pulled the rug on Tommy's. The Defendants not only failed to pay the rebates and interest recovery that was owed, but they also took several actions that made it impossible for Mr. Borisch to avoid a default with M&T Bank, the lender for Mr. Borisch and his dealerships.

7.     During the same time period, Malibu and Mr. Springer nevertheless repeatedly assured Mr. Borisch that it "wouldn't let Tommy's down," and that it would "[m]ake it right," as they encouraged Mr. Borisch to step in and solve the M&T Bank issue that Malibu had created. Relying upon the Parties' extensive prior business history and the Defendants' assurances, and believing Defendants to be acting in good faith, Mr. Borisch stepped up in a big way. In addition to personally guaranteeing the substantial increase in floor plan financing with M&T Bank, Mr. Borisch also liquidated other assets and borrowed additional funds, personally, to infuse nearly $30 million in additional capital into the dealerships.

8.     Ultimately, however, the Defendants' actions, in combination with the broader industry downturn, forced the dealerships into violating its agreements with M&T Bank. Citing the issues with M&T Bank that Defendants' fraudulent scheme had caused, Malibu then purported to terminate all of its agreements with Mr. Borisch's dealerships on March 22, 2024. Without Malibu honoring its commitments, the option of selling the remaining inventory – then valued at

approximately $110 million – in a commercially reasonable manner was taken off the table by M&T Bank. Further, Malibu began soliciting the dealerships' employees and took other steps that were intended to prevent the dealerships from being able to compete in the tow boat market in the future.

9.      Malibu and Mr. Springer knew at the time they induced Mr. Borisch to increase the dealerships' floor plan, to provide his own money for Tommy's operations, and to personally guarantee millions of dollars in loans that their representations to Mr. Borisch were false and that it was all but certain that Mr. Borisch would personally suffer disastrous consequences when the dealerships inevitably failed – dealerships that Mr. Borisch had been offered $100 million for less than 2 years prior.

10.      Throughout the relevant period, Malibu and Mr. Springer withheld information and/or misrepresented information to Mr. Borisch regarding, among other things, their intentions with respect to the dealership agreements and repurchase agreements; the incentives, rebates, and interest recoupment payments; their expectations for the business; and the market for recreational tow boats. At the same time, the Defendants also made it clear to Mr. Borisch that they would retaliate if he did not comply with their demands. The Defendants' scheme to artificially inflate Malibu's sales figures at Mr. Borisch's expense became clear to Mr. Borisch only after the damage had been done.

11.      The financial consequences for Mr. Borisch, personally, that resulted from the Defendants' conduct were severe. The Defendants' actions effectively destroyed his business and virtually his entire net worth. Mr. Borisch lost tens of millions of dollars that he invested in Tommy's in furtherance of the referenced actions, both directly and through personal guarantees of the necessary loans. Mr. Borisch would not have made those additional investments or

5

guaranteed those additional loans but for the misrepresentations and false assurances made by Mr. Springer and Malibu in furtherance of their fraudulent scheme. While Malibu was left with misleadingly inflated sales figures, Mr. Borisch was left with the mountain of debt as collateral damage to Malibu's fraudulent scheme. Mr. Borisch is entitled to significant money damages, including direct, indirect, consequential, and punitive damages based upon Defendants' wrongful conduct.

## PARTIES, JURISDICTION, AND VENUE

12. Matthew Allen Borisch is a citizen and resident of Michigan.

13. Defendant Malibu Boats, LLC is a Delaware limited liability company with its principal place of business in Loudon, Tennessee. Malibu Boats, LLC's members are as follows:

a. Malibu Boats, Inc., a Delaware C-Corp trading on the NASDAQ under the ticket MBUU, with its principal place of business located in Tennessee, owns 97.205%;

b. Horizon Holdings, LLC, a California limited liability company with its principal place of business located in California, which is owned by two members—Philip S. Estes and James M. Shoring, both of whom are residents of and are domiciled in California—owns 2.139%;

c. Dan Gasper, who is a resident of and is domiciled in California, owns 0.253%;

d. Mark Lanigan, who is a resident of and is domiciled in Utah, owns 0.117%;

e. Malibu Holdings L.P., an Ohio limited partnership, is wholly owned by Horizon Holdings, LLC—which, with the residency pled in (b) above, makes it a resident of California—owns 0.091%;

f. Michael Hooks, who is a resident of and is domiciled in California, owns

6

0.058%;

> g.      Scott Davenport, who is a resident of and is domiciled in Texas, owns 0.047%;

> h.      Brad Ditchfield, who is a resident of and is domiciled in Tennessee, owns 0.038%;

> i.      Jack Springer, who is a resident of and is domiciled in Texas, and who is Malibu's former CEO, owns 0.023;

> j.      Wayne Wilson, who is a resident of and is domiciled in Tennessee, and who was Malibu's CFO during much of the relevant period, owns 0.017%;

> k.      Ritchie Anderson, who is a resident of and is domiciled in Tennessee, owns 0.011%.

14.     Defendant Malibu Boats, Inc. is a Delaware corporation that was incorporated in Delaware and has its principal place of business in Tennessee.

15.     Defendant Jack Springer is a resident of and is domiciled in Texas. For much of the relevant time period, Mr. Springer was Malibu's CEO, and may be served with process at 6101 Theresa Lane, Colleyville, Texas 76034-3154.

16.     Complete diversity exists between Plaintiff and Defendants because they are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees, and Plaintiff seeks equitable relief. Accordingly, this court has subject matter jurisdiction over this action under 28 U.S.C. §1332.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Malibu and Mr. Springer are subject to this Court's personal jurisdiction by virtue of their regular and systemic conduct of business in this District. Venue is also appropriate in this Court because much of the tortious conduct that is at issue in this case occurred in this District.

7

## FACTUAL ALLEGATIONS

18.     Tommy's was the largest national dealer for Malibu boats in the recreational power boat/tow boat space.

19.     Tommy's had 15 dealerships across the country and accounted for more than 30% of the total sales of Malibu and Axis branded power boats/tow boats.

20.     Mr. Borisch was the sole owner of each of the Tommy's dealerships, either directly or through the Matthew Allen Borisch Trust, for which Mr. Borisch serves as the trustee.

21.     Mr. Borisch was one of the primary, if not sole, points of contact for Tommy's since the business relationship between Tommy's and Malibu began.  Mr. Borisch routinely communicated, on behalf of himself and Tommy's, with various individuals at Malibu.  Many of his discussions and negotiations were with Jack Springer.

22.     As further described below, Mr. Borisch personally provided the funds or guaranteed the loans that were used in furtherance of the actions that were taken by and/or on behalf of Tommy's that are at issue in this case.

### Malibu's Business Model

23.     Malibu promotes itself as a leading designer, manufacturer, and marketer of a diverse range of recreational power boats, including performance tow boats, under the brands of Malibu and Axis.

24.     The Malibu brand purports to include the latest innovations in performance, comfort and convenience, and different models sell at retail for between $80,000 and more than $300,000 per boat. The Axis brand purports to provide more affordably priced, entry-level performance boats, which retail for between $80,000 and more than $175,000 per boat.

25.     Malibu boasts that it maintains the number one market share position in the United

8

States in the performance sport boat category through its Malibu and Axis brands.

26.     The majority of Malibu's sales are made pursuant to floor plan financing programs, in which Malibu participates on behalf of its dealers through a contingent repurchase agreement with the dealership's lender.

27.     Under such an arrangement, a dealer establishes a line of credit with a lender for the purchase of boat inventory from Malibu.

28.     When a dealer purchases and takes delivery of a boat pursuant to a floor plan financing arrangement, it draws against its line of credit, and its lender pays the invoice cost of the boat directly to Malibu. This amounts to a sale for Malibu ("Sale").

29.     The majority of Malibu's dealers have floor plan financing arrangements with lenders in order for the dealers to fund the purchase of Malibu boats.

30.     Those arrangements provide liquidity to Malibu by financing dealer purchases of Malibu's products and minimizing the use of Malibu's working capital in the form of accounts receivable.

31.     The majority of Malibu Sales are financed under similar arrangements pursuant to which Malibu receives payment for the Sale within a few days of shipping a boat to a dealer.

32.     Malibu represents that it provides its dealers' floor plan lenders with repurchase agreements to support their loan facilities (and the dealers), whereby Malibu agrees to repurchase boat inventory repossessed by a dealers' floor plan lender if a dealer defaults on its debt obligations to the lender, subject to certain limitations.

33.     A repurchase agreement for boats in connection with a floor plan financing arrangement is customary in the industry, and it also discourages a manufacturer from pumping its dealers full of inventory without regard to market demand, and provides accountability for

9

inventory levels as to both the manufacturer and the dealerships.

### The Relationship Between Malibu and Tommy's

34.     Tommy's began its relationship with Malibu 12 years ago.

35.     For 12 years, Malibu entered into dealership agreements with each of Tommy's dealerships.

36.     The terms of these dealership agreements, with the exception of those in Texas, ran from July 1 to June 30 each year.

37.     All of the Dealership Agreements specifically provided that Malibu would provide each dealer with a new agreement, or otherwise provide notice of non-renewal or termination of the previous agreement, reasonably in advance of the existing agreement's expiration.

38.     Historically, and consistently, the parties would allow the current dealership agreements to expire before beginning negotiations of new model-year dealership agreements, and while continuing to operate under the terms of the latest expired-term dealership agreements for months.

39.     For the first 11 years, Malibu and Tommy's worked as true partners.  During that period, Mr. Borisch did everything Malibu asked of him to help Malibu protect and grow its market share through the good times, and the bad, in the industry.

40.     For example, on multiple occasions, Malibu approached Mr. Borisch about buying other Malibu dealerships that had been struggling.  On each occasion, Mr. Borisch attempted to do as Malibu requested and, in most instances, successfully purchased the business in question using funding that Mr. Borisch, personally, either provided or facilitated.

41.     Primarily through Mr. Borisch's efforts, Tommy's went from operating four (4) dealerships in 2017 to operating 15 dealerships by 2022.

10

42.     In 2022, Tommy's ordered more than 1,100 boats from Malibu.  In 2023, Sales to Tommy's represented approximately 10.7% of Malibu's consolidated net sales for its fiscal year ending June 30, 2023.

43.     Like the majority of Malibu's dealerships, Tommy's had a floor plan financing arrangement.  Historically, Malibu provided each of Tommy's floor plan lenders with a repurchase agreement, whereby Malibu agreed to repurchase boats purchased by Tommy's using the lender's funds in the event of a default by Tommy's.  That was true until the end of 2022, when Tommy's was forced to change lenders from Fifth Third Bank (which had previously served as Tommy's floor plan lender) to M&T Bank due to the Defendants' demand that Mr. Borisch increase his dealership's floor plan limits to $160 million.

44.     In order to accommodate Defendants' demands, Tommy's entered into a floor plan financing agreement with M&T Bank in May 2023.

45.     Contrary to both the Parties' custom and practice and the widely accepted industry standard, Malibu and M&T did not enter into a repurchase agreement when Tommy's moved its floor plan loan facility from Fifth Third Bank to M&T Bank.  However, Malibu subsequently represented publicly that it would enter into a repurchase agreement with M&T Bank.  Malibu later represented to Mr. Borisch, personally, that it would enter into a repurchase agreement with M&T Bank in order to induce Mr. Borisch to consent to accepting inventory that Tommy's did not need, and to provide or personally guarantee certain funding that Tommy's needed to stay afloat as a result of Malibu's scheme.

46.     The Parties also entered into agreements, each year, that provided that Tommy's would receive rebates and incentive-based payments based upon sales, as well as interest recovery relating to the loans Tommy's was maintaining in order to finance its operations.  Malibu

committed to pay those amounts each year as a necessary incentive to cause Tommy's to order boats and in order to permit Tommy's to sell boats. Malibu committed to paying the same categories of incentives, rebates, and interest recoupment for model year 2023.

47. As further described below, in 2023, as Malibu was continuing to pressure Tommy's to take on more and more inventory, Scott Davenport, on behalf of Malibu, represented to Mr. Borisch that Malibu was honoring its agreement to pay the rebates and incentives, and pay for interest recovery.

48. In 2021, the incentives, rebates, and interest relief payments owed by Malibu to Tommy's totaled more than $3 million. That figure dropped to just below $3 million in 2022. In 2023, that figure would have substantially increased due to the increase in the number of boats pushed onto Tommy's. However, Malibu failed to honor its agreements regarding the rebates, incentives, and interest payments, and refused to pay Tommy's what was owed under those agreements.

**The COVID-19 Pandemic and its Impact on the Boating Industry**

49. During the COVID-19 pandemic, domestic retail demand for recreational powerboats increased to the highest levels in decades, as customers turned to boating as a form of outdoor socially distanced recreation.

50. By the second half of 2021, however, retail registration activity in the recreational powerboat market began declining due to limited available inventory due to the strong sales activity during the pandemic and supply chain disruptions that began impacting production levels.

51. In 2022, retail registration activity continued to decline.

52. By 2023, the industry demand was 50% of what it was in 2022.

53. There are substantial fixed costs associated with Malibu's business. Because of

12

those fixed costs, Malibu must meet certain manufacturing and sales thresholds in order to maintain profitability. In other words, Malibu's profitability (*i.e.*, its stock price) depends in large part on its ability to spread its fixed costs over a sufficiently large number of products manufactured and sold. If Malibu's production volume decreases, its gross profit margins go down, as well.

54. Consequently, decreased demand, or the need to reduce production, directly affects Malibu's ability to absorb fixed costs and materially impacts its financial condition (*i.e.*, its stock price).

55. Against this backdrop, in December 2022, Mr. Springer demanded that Mr. Borisch commit to Tommy's discontinuing its relationships with every other boating manufacturer, or voluntarily give up several of the territories that it had acquired – in most instances, at Malibu's request. Mr. Springer further demanded that Mr. Borisch walk away from a dealership purchase that, yet again, Mr. Springer had asked Mr. Borisch to pursue, after Mr. Borisch had already made a nonrefundable deposit of approximately $1 million. When Mr. Borisch refused to agree to Mr. Springer's demands, the meeting became heated. Mr. Springer yelled at Mr. Borisch and poked his finger in Mr. Borisch's chest.

**Malibu's Fraudulent Scheme and Misrepresentations**

56. In 2023, with national sales forecasted to be approximately 50% of 2022 sales, Springer and Malibu contrived a scheme to artificially boost Malibu's Sales and profitability by shifting the anticipated losses caused by declining demand onto Mr. Borisch and his dealerships.

57. In the second half of 2022, Defendants first began a campaign designed to coerce Mr. Borisch to increase Tommy's available floor plan financing from $50 million to $160 million so that it could purchase additional Malibu inventory. Defendants knew and understood that the

13

funding for the expansion would be provided by or obtained through Mr. Borisch, personally.

58.     The first meeting in which Mr. Springer and Malibu told Mr. Borisch that it needed him to accomplish the referenced increase in Tommy's floor plan financing occurred in July 2022. In that meeting, Mr. Springer, along with Wayne Wilson, pressured Mr. Borisch to commit to increasing Tommy's existing floor plan credit facility to $160 million.  Mr. Wilson presented the figure Malibu was demanding on a piece of paper, which he slid across a table to Mr. Borisch.

59.     In that discussion with Mr. Borish and in those that followed, Mr. Springer and Malibu indicated that Tommy's would need to have 25 weeks of inventory in stock at the turn of the model year, based on Malibu's market analysis.   At the time, Tommy's was only indebted under its floor plan financing arrangements for approximately $30 million, leaving $20  million  of purchasing and  financing capacity.  To have a minimum of 25 weeks of inventory of 2023 model year boats, Tommy's would need to increase its floor plan by more than a factor of five.

60.     Mr. Springer misrepresented Malibu's market data in order to induce Mr. Borisch to agree to seek an increase in Tommy's floor plan limits.   Specifically, Mr. Springer falsely represented that Malibu's market data supported its demand that Mr. Borisch arrange for the massive increase in floor plan capacity when, in fact, Malibu was already expecting a drastic downturn in the relevant market.  Mr. Borisch was not privy to Malibu's full data or analysis.

61.     As part of its Dealership Agreements with Malibu, Tommy's was entitled to earn incentives related to  sales of Malibu products. The incentives include interest reimbursement, rebates, advertising reimbursements, and discounts.  Numerous times each year, Malibu would offer various incentive programs through which dealers, including Tommy's, could earn such incentives.

62.     The  incentive  programs  offered  by  Malibu  were  a  key  source  of  income  for

Tommy's. Further, Tommy's relied upon the incentives programs to offset lulls in seasonal sales, increased costs, mandated advertising required by Malibu, and to cover the interest charged by a floor plan lender for inventory on the floorplan during low seasons.

63.     In the 2022 fiscal year, Tommy's had earned significant incentives for which Tommy's has demanded payment, but Malibu refused to pay the amounts owed in full. Instead of meeting its obligation to pay those incentives, Malibu withheld the incentives and used false promises of additional incentives to be earned as additional financial pressure on Mr. Borisch to increase Tommy's floor plan financing capacity.

64.     In combination with Mr. Springer's demand that Mr. Borisch cease doing business with other manufacturers or give up some of its territories, Defendants made clear that Tommy's would have to comply with their demands relating to floor plan capacity or face severe financial consequences. At the same time, Defendants continued to make assurances regarding Malibu's own market research and expectations for the coming year that purportedly justified the need for the increase in floor plan financing.

65.     At the same time Malibu was engaged in a concerted effort to force Mr. Borisch to increase Tommy's floor plan capacity so that it could take on additional inventory, Malibu engaged in related efforts to force Tommy's floor plan lender at the time, Fifth Third Bank, to acquiesce to Malibu's demands. On or about December 16, 2022, Wayne Wilson called Mr. Borisch's primary point of contact with the bank, Rick Budinger, and demanded that the bank immediately fund the boats that Malibu had shipped or else "bad things would happen."

66.     Mr. Borisch ultimately succumbed to Malibu's campaign. Based upon the pressure that Malibu was applying and its (false) assurances regarding its research and expectations, Mr. Borisch increased Tommy's existing floor plan capacity from $50 million to $85 million with Fifth

Third Bank and then to $110 million with a $20 million overlimit with M&T Bank.

67.    In furtherance of its scheme, Mr. Springer and Malibu also misrepresented to Mr. Borisch that Malibu would sign a repurchase agreement with Tommy's lender, M&T Bank, but ultimately refused to do so.  Over the previous eleven years, Malibu had provided Tommy's floor plan lender with a repurchase agreement.  Consistent with that fact, Malibu represented publicly and to Tommy's new lender, M&T Bank, that Malibu would support the increased floor plan with a repurchase agreement, just as it had in the prior years.  Mr. Borisch was made aware of those representations and relied upon those representations when he decided to move forward with accepting inventory from Malibu over the following months.

68.    The repurchase agreement that Malibu promised to enter into, consistent with both the custom and practice of the Parties and with industry standards, would have protected both M&T Bank and Mr. Borisch in the event Tommy's defaulted on its loan obligations: Malibu would repurchase Tommy's inventory, just as Malibu had done for the benefit of Tommy's and Fifth Third Bank (and all prior lenders) on Tommy's previous floor plan facilities. A repurchase agreement also protects Malibu's ability to control its boats in the market.

69.    Malibu knew at the time that it insisted that Mr. Borisch increase the floor plan that the boating industry, generally, and Malibu, in particular, were going to experience significant declines in sales to customers (as opposed to "sales" to its own dealers) in 2023.  As a result, Malibu also knew that Tommy's would not need a substantial increase in floor plan capacity in order to meet customer demand in 2023.  Thus, Mr. Springer and Malibu knew or should have known that their representations to Mr. Borisch to the contrary were false. At the time Mr. Springer and Malibu made the referenced representations regarding their market analysis, they intended for Mr. Borisch to rely upon those representations.

16

70.    After successfully inducing Mr. Borisch to expand Tommy's floor plan capacity, Malibu immediately began to pump its inventory onto Tommy's. During the same time period, Malibu also refused to honor Tommy's requests for a model mix Tommy's could actually sell and that was based upon historic demand (*i.e.*, Malibu refused to agree to provide a model mix where more than 35% the boats were Axis-model boats).

71.    The inventory that Malibu forced upon Tommy's was the highest priced, highest margin Malibu brand boats. The most expensive Malibu brand boats have higher margins for Malibu, and the purported "sales" of those premium boats to Tommy's were used to inflate Malibu's numbers.

72.    Malibu knew that Tommy's would struggle to sell the higher end boats under the prevailing market conditions at the time. Further, Malibu also knew that its premium boats would also tie up substantially more of Tommy's floor plan and cost Tommy's substantially more in interest to carry due to the slow pace at which they are sold. At the same time, Malibu refused to provide the Axis brand boats that would have been much easier for Tommy's to sell.

73.    When Mr. Borisch attempted to push back against Malibu regarding the inventory mix, Mr. Springer and Malibu falsely represented to Mr. Borisch that he and his team had misread the market and that their strategy of focusing on sales of the Axis boats and other lower-end boats was not supported by its analysis. At the time Mr. Springer and Malibu made those representations to Mr. Borisch, they intended for him to rely upon its misrepresentations. However, Mr. Springer and Malibu knew or should have known that their misrepresentations regarding the inventory mix were false.

74.    After a relatively positive start to the year, Tommy's began to experience a significant decline in sales. Notwithstanding that decline – which Malibu was aware of and had

anticipated – Defendants continued to pressure Mr. Borisch to take on additional inventory over the first several months of 2023.

75. In May 2023, even though Malibu knew that Tommy's already had more inventory than it needed, Malibu again pressured Tommy's to take on additional inventory in order to further artificially inflate its sales figures. When Mr. Borisch pushed back, Scott Davenport, acting on behalf of Malibu, assured Mr. Borisch that Malibu was honoring its agreement to pay the rebates and incentives, and pay for interest recovery, so long as he continued to take on the inventory, as Malibu was demanding.

76. Based upon and in reliance upon Mr. Davenport's misrepresentation regarding Malibu's commitment to paying the rebates, incentives, and interest recovery payments; Malibu's assurances that it intended to enter into new dealership agreements for the following year over the coming months; and Malibu's misrepresentations regarding its market analysis, Mr. Borisch consented to Malibu's request to take on additional inventory. Tommy's eventually accepted approximately $50 million in additional inventory from Malibu during the months of May and June 2023.

77. During the same period of time, Mr. Borisch also finalized the new floor plan agreement with M&T Bank. As a condition for its agreement to fund a floor plan at the level that Malibu had demanded and that Tommy's would need in order to pay for the additional inventory that Malibu was insisting that Tommy's accept, M&T Bank required that Mr. Borisch sign a personal guarantee. Mr. Borisch agreed to that condition, based upon and in reliance upon Defendants' false statements and promises regarding: (i) Malibu's market data and analysis for the relevant time period, which, according to Defendants, supported the increase in floor plan capacity and a massive influx in new inventory; (ii) Malibu's payment of rebates, incentives, and interest

payments to Tommy's; (iii) Malibu's representations and assurances that it would finalize a repurchase agreement with M&T Bank; and (iv) Malibu's repeated assurances that it intended to move forward with new dealership agreements for the 2024 fiscal year.

**The Harm Caused by Defendants' Scheme and Mr. Borisch's Efforts to Save Tommy's**

78.     As a result of Defendants' actions in combination with the downturn in the market, Tommy's continued to struggle into and through the summer months of 2023.  Defendants' concerted efforts to force Borisch to increase Tommy's floor plan capacity and take on an unreasonable volume and mix of inventory had made it impossible for Tommy's to hit sales targets and buried Tommy's in interest, which Malibu had previously promised to pay as an incentive to take delivery of the next model year early.  In addition, Tommy's was paying an enormous amount of interest per month on the floor plan (for which Malibu had promised to reimburse Tommy's), and sales had not improved enough to offset the costs.

79.     Tommy's eventually ran out of floor plan capacity and was faced with being unable to make the required loan payments on time.

80.     After it became clear that Tommy's needed help in order to move forward and continue operations, Mr. Borisch approached Mr. Springer and asked him and Malibu to honor their prior commitments to pay Tommy's the incentives and rebates that they had committed to pay.  By August 2023, Malibu was nearly $7 million behind on incentives, rebates, and interest payments that were owed to Tommy's – a number that ballooned to more than $14 million by March 2024.

81.     In response to Mr. Borisch's request for help, Malibu not only reneged on  its promise to reimburse Tommy's for  the  carry  interest, but also indicated that it would not pay Tommy's the other incentives and rebate payments that it was owed.

19

82. During the same time period, Malibu and Tommy's entered into discussions regarding the dealership agreements for the 2024 fiscal year. However, those discussions stalled when Malibu insisted that Tommy's commit to a purchase of 1,160 boats for the upcoming year, even though Malibu knew that Tommy's already had far too much inventory. When Tommy's countered with lower figures, Malibu refused to accept, and the negotiations stalled. For more than three months, the discussions between the Parties regarding the 2024 dealership agreements stalled as a result of Malibu's insistence that Tommy's commit to taking on far more inventory than it could pay for or reasonably expect to sell.

83. Later, when the Defendants' scheme caused Mr. Borisch's dealerships to violate their agreements on their obligations with M&T Bank, Malibu informed Tommy's that on that basis, it was discontinuing negotiations regarding the dealership agreements. In short, Malibu used the financial crisis that it had orchestrated in furtherance of its fraudulent scheme as a justification for refusing to enter into the new dealership agreements, despite its repeated assurances to Mr. Borisch that it would do so.

84. Defendants knew that their refusal to continue negotiations regarding the dealerships, as well as their refusal to enter into repurchase agreements with M&T Bank, would further jeopardize Tommy's ability to maintain its agreements with M&T Bank, which, in turn, would cause personal financial damage to Mr. Borisch. In short, Defendants not only left Tommy's to fend for itself after leading Tommy's into the crisis it was facing, but they also continued to create additional obstacles to prevent Mr. Borisch and his dealerships from moving forward and to all but ensure personal financial damage to Mr. Borisch.

85. As a result of Defendants' actions in forcing Tommy's to accept inventory that it did not need and that it could not sell, as well as refusals to pay the incentives, rebates, and loan

repayments that it owed, Tommy's was forced to accept unfavorable loan terms in order to stay afloat. By August 2023, Tommy's was paying approximately $1.2 million in interest per month – interest that Malibu had previously assured Tommy's it would reimburse.

86.  In order to pay down the debts, Tommy's was forced to use up most of its working capital, which also put Tommy's at risk of failing to meet the conditions of its loans with M&T Bank.

87.  During the same time period, and notwithstanding its role in causing Tommy's financial crisis, Mr. Springer and Malibu encouraged Mr. Borisch to weather the storm and assured Mr. Borisch that Malibu would "make it right" after he and his dealerships stabilized its situation with M&T Bank.

88.  Yet again, based upon the Parties' history of dealing and Defendants' assurances regarding intentions and promises to honor the Parties' agreements, Mr. Borisch personally stepped in to keep Tommy's in operation. In September 2023, in order to ensure that Tommy's would be able to successfully get through the audit required by M&T for October 2023, Mr. Borisch personally leveraged most of his remaining personal assets as well as certain assets of his family members in order to get a bridge loan to pay down Tommy's debts.

89.  The bridge loans obtained by Mr. Borisch allowed Tommy's to temporarily improve its standing with M&T Bank, but Malibu's position, as well as its unwillingness to work in good faith with Tommy's, did not change. Mr. Springer and Malibu subsequently continued to refuse to enter into new dealership agreements with Tommy's, despite their prior assurances that Malibu would do so, and despite Mr. Borisch's extraordinary personal efforts to keep Tommy's in good standing with its lender.

90.  As grounds for Malibu's ongoing refusal to enter into the dealership agreements

21

over the fall in 2023, Mr. Springer claimed that Tommy's needed to first pay another $6 million to Malibu for additional boats that Malibu had previously sent to Tommy's. Malibu refused to allow Tommy's to return the additional inventory, even though Malibu knew when it successfully pressured Tommy's into accepting those boats (in order to maintain the artificially inflated "sales" figures) that Tommy's already had too much inventory. Malibu also continued to refuse to give Tommy's credit for the millions of dollars in incentives, rebates, and interest reimbursement payments that it already owed to Tommy's.

91. Although Mr. Borisch initially refused to pay the additional $6 million to Malibu, he ultimately determined that there was no choice but to pay it, because Malibu's refusal to enter into new dealership agreements had, by December 2023, put Mr. Borisch's entire business in jeopardy. Among other issues, Mr. Borisch knew that absent signed dealership agreements, Tommy's would lose its floor plan agreement with M&T Bank.

92. Between September and December of 2023, Mr. Borisch injected approximately $22 million of his own money or funds that he had guaranteed into Tommy's in order to keep the businesses operating. Mr. Borisch's willingness to provide that funding was based upon his belief in and reliance upon Defendants' misrepresentations detailed above.

93. For the same reasons and based upon the same misrepresentations by Mr. Springer and Malibu, Mr. Borisch sold his interests in two other businesses in January 2024 in order to obtain an additional $7 million, which was also used to keep Tommy's operating.

94. Mr. Borisch has continued to pay high interest rates on the nearly $30 million in funds that he personally injected into Tommy's between September 2023 and early 2024.

**Malibu's Purported Termination and Its Aftermath**

95. Through early February 2024, Malibu continued to treat Tommy's like a dealer

under the same terms and conditions as set forth in the Dealership Agreements. Between the the summer of 2023 and April of 2024, Tommy's represented Malibu at approximately 20 boat shows at Malibu's request.

96. While at a Miami, Florida boat show in February 2024, Mr. Borisch was pulled aside by three Malibu stakeholders to discuss Tommy's Dealership Agreements with Malibu.

97. The stakeholders disclosed to Mr. Borisch their understanding of what Malibu and its CEO, Jack Springer, had done to Borisch (i.e., "intentionally pumping Tommy's full of inventory" in order to artificially inflate Malibu's sales and market share when "most manufacturers are 70% too heavy on inventory and he knows that"). They also reported that "Jack would not turn the spigot off" (i.e., meaning he would not cut back on manufacturing) despite what the market was showing. They told Mr. Borisch that Wayne, the former CFO, left on "bad terms" and they were "nervous." They also asked Mr. Borisch to "hold on" as "Jack is not going to last."

98. The very next week, Malibu announced that Springer would be "stepping down" as CEO and Michael Hooks, current Board Chair, would be stepping in as the interim CEO.

99. Notwithstanding its knowledge of Mr. Springer's conduct, Malibu represented to the public that "[w]hile retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023." However, Malibu knew that demand was down significantly, and that its numbers had been artificially inflated as a result of its own demand that Tommy's carry 25 weeks of inventory (despite the lack of customer demand) and that Tommy's accept the model mix of boats heavily skewed toward the Malibu brand (as opposed to the Axis brand that Tommy's had ordered and Malibu agreed to deliver).

23

100.     After 8 months of discussions, during which Mr. Springer and Malibu repeatedly assured Mr. Borisch that Malibu would enter into dealership agreements for the 2024 fiscal year, Malibu finally sent notice, on February 26, 2024, that it was not going to enter into any dealership agreements for that year.

101.     Malibu also never executed a repurchase agreement for the full floor plan with M&T Bank, despite its repeated assurances to Mr. Borisch that it would do so.

102.     On Wednesday March 20, 2024, Mr. Borisch met with Malibu's Chairman /Interim CEO, Michael Hooks, and had a very productive, positive meeting about the future of the 12-year business relationship between Tommy's and Malibu. Mr. Borisch left the meeting believing the relationship would continue as it had for the prior 11 years.

103.     Two days later, on Friday March 22, 2024, Tommy's received a letter from Malibu purporting to terminate Malibu's business relationship with all of Tommy's dealerships. Mr. Springer, who was on the way out as CEO, signed the notice of termination rather than Mr. Hooks.

104.     In light of the positive meeting that took place with Mr. Hooks just two days prior, Mr. Borisch called Mr. Hooks to confirm that the letter signed by Mr. Springer was in fact the final word from Malibu and that Mr. Hooks endorsed Mr. Springer's decision. Mr. Hooks confirmed that he, in fact, endorsed Mr. Springer's decision and that it was the final word from Malibu.

105.     Despite the negative forecast for boat sales in 2023 and a general sales decline in the industry, Malibu boasted positive sales performance and increased market share during that same time period.

106.     Malibu was able to do so because of its scheme to "keep the spigot on" and achieve Sales by dumping inventory into Tommy's (without following through with its obligation to repurchase the unsold inventory) after demanding that Tommy's increase its floor plan capacity.

24

By forcing the excess supply onto Tommy's without fulfilling its commitment to execute a repurchase agreement, Malibu was able to represent to the public that it had achieved significant sales and increased its market share above and beyond its competitors in the industry. Malibu was consequently able to manipulate investors into believing that Malibu outperformed the industry.

107.    April begins the busiest three-month season of the year in the boating industry, and the industry standard is for boat manufacturers to have agreements in place with dealerships to sell their products during this entire cycle to maximize sales. When Malibu terminated its relationship with Tommy's just prior to the start of the peak boat sales season, they left Mr. Borisch with no alternative boat suppliers and the inability to locate a replacement supplier until the peak sales season ends. In other words, Malibu's scheme worked like a charm. Malibu was able to dupe the market and destroy its largest potential competitor (from a dealership standpoint) in the process.

108.    During the same time period, Malibu also began to solicit Tommy's employees away from Mr. Borisch's dealerships and began to approach third-party dealerships about taking over the Malibu/Axis business in regions where Mr. Borisch's dealerships were still operating.

109.    Then, pouring salt in the wound, Malibu sent Tommy's a bill, in March 2024, for over $600,000, for interest that it claimed Tommy's owed relating to inventory that it had sent in 2023 that had not been "floored" and that it knew Tommy's did not need.

110.    The resulting financial harm to Mr. Borisch, personally, was enormous. He has sustained tens of millions of dollars in losses as a result of Malibu's misconduct, as described herein.

111.    As a result of the Defendants' actions, Mr. Borisch's most significant personal assets – his interests in Tommy's – have been destroyed, as Tommy's was forced into bankruptcy.

112.    In addition, as a direct result of Defendants' misconduct, Mr. Borisch lost nearly

$30 million of his own money, which he obtained by leveraging various personal assets and through the sale of other businesses, that he had put directly into the business based upon and in reliance upon Malibu's repeated false assurances and misrepresentations. Mr. Borisch continues to pay high interest rates on those funds.

<u>**COUNT I**</u>
**Fraudulent Misrepresentation – Malibu and Mr. Springer**

113.     The allegations of paragraphs 1 through __ of the Complaint are incorporated herein by reference.

114.     Malibu and Mr. Springer purposefully and intentionally made numerous false statements and omissions that Mr. Borisch relied upon to his detriment over a period of more than a year.

115.     Malibu and Mr. Springer falsely and intentionally misrepresented to Mr. Borisch that its market data supported the massive increase in floor plan capacity that it had demanded starting in the summer of 2022 when, in fact, Malibu and Mr. Springer already knew there would be a significant downturn in sales and in the broader market, generally, in the coming year.

116.     Malibu and Mr. Springer purposefully and intentionally misrepresented and/or mischaracterized the data and other information known to them at the time in order to induce Mr. Borisch to acquiesce to their demand to increase Tommy's floor plan capacity. Their purpose was to lay the groundwork for Defendants' plan to flood Tommy's with inventory in order to artificially inflate Malibu's sales figures.

117.     Mr. Borisch did, in fact, reasonably rely upon Malibu's and Mr. Springer's misrepresentations and/or mischaracterizations of their analysis and their data when he agreed to facilitate an increase in Tommy's floor plan capacity.

118.     Malibu and Mr. Springer also repeatedly misrepresented to Mr. Borisch that they

believed that Tommy's needed the volume and mix of inventory that Malibu was forcing Tommy's to accept in order to meet sales and market share goals, rather than the volume and inventory mix that Mr. Borisch and his team at Tommy's had repeatedly requested that Malibu provide.

119.   Malibu and Mr. Springer knew, at the time Malibu was forcing Tommy's to accept an unreasonably high volume of inventory and a mix of inventory that was heavily skewed towards higher-end and harder-to-sell boats that it would be difficult if not impossible for Tommy's to sell those boats, given prevailing market conditions.   The purpose of those misrepresentations was to induce Tommy's to accept higher-end inventory in order to artificially inflate Malibu's sales figures.

120.   Despite knowing that their misrepresentations to Mr. Borisch regarding market conditions and consumer demand were false when made, Defendants did not disclose the truth to Mr. Borisch, even as consumer demand continued to decline and even as Mr. Borisch continued to rely upon Malibu's misrepresentations.

121.   Mr. Borisch relied upon the misrepresentations and omissions made by Malibu and Mr. Springer regarding market conditions, consumer demand, and the appropriate inventory mix when he gave in and agreed to accept the volume and inventory mix that Malibu was demanding that Tommy's accept.

122.   In addition, between May and September 2023, Malibu and Mr. Springer purposefully and intentionally misrepresented to Mr. Borisch, on numerous occasions, that: (1) Malibu was honoring its prior agreements and adhering to the Parties' customs and practices relating to rebates, incentives, and interest recoupment payments; (2) Malibu would enter into new dealership agreements for the 2024 fiscal year; and (3) Malibu would enter into a repurchase agreement with M&T Bank, notwithstanding the fact that it had not done so as of the time that the

floor plan agreement went into effect. Those representations were false, as Defendants never intended to take these actions, as doing so would undermine their fraudulent scheme to inflate Sales and pass off losses caused by declining demand to Tommy's.

123. Given the Parties' prior course of dealing in which Malibu and Tommy's had worked together as partners and in good faith, Mr. Borisch reasonably relied upon these misrepresentations to his detriment in several respects. First, Mr. Borisch agreed to again seek a larger floor plan agreement of more than $100 million, consistent with Malibu's prior demands. Second, in order to facilitate the finalizing of that agreement with M&T Bank, Mr. Borisch signed a personal guarantee relating to the floor plan agreement. Third, Mr. Borisch continued to accept inventory the dealerships ultimately could not sell and that Malibu knew the dealerships did not need, including more than $25 million in new inventory over the months of May and June 2023. Mr. Borisch would not have agreed to any of those actions but for Malibu's and Mr. Springer's misrepresentations, as described.

124. Defendants continued to make the same misrepresentations over the following months, as it continued to string Tommy's along through the summer of 2023. During that period of time, Defendants continued to pump inventory into Tommy's but continued to delay in entering into dealership agreements, continued to withhold the incentive, rebate, and interest recoupment payments that were owed, and continued to refuse to sign a repurchase agreement with M&T. However, Mr. Springer and Malibu continued to assure Mr. Borisch that it would take these actions and "make it right."

125. Based upon those false assurances and the Defendants' other misrepresentations and omissions, as described, Mr. Borisch personally provided or guaranteed nearly $30 million in additional funds over the following 5 months in order to keep Tommy's operating. Had Mr.

Borisch known that Defendants' representations regarding market conditions and consumer demand were false, and that Malibu and Mr. Springer did not intend to enter into dealership agreements, sign the repurchase agreement, or pay the incentives, rebates, or interest recoupment payments owed, Mr. Borisch would not have continued to pour his own money into Tommy's during that period of time.

126. During the same period of time, Malibu also made false representations and promises of additional incentives that could be earned based upon sales when, upon information and belief, it had no intention of making such incentives payments.

127. Mr. Borisch reasonably and justifiably relied on all of the referenced misrepresentations and omissions made by Malibu and by Mr. Springer.

128. Malibu and Mr. Springer knew or should have known that Mr. Borisch would rely upon the referenced false assurances, misrepresentations, and omissions.

129. Malibu and Mr. Springer intended and desired for Mr. Borisch to rely upon the referenced false assurances, misrepresentations, and omissions because they intended to use Mr. Borisch and Tommy's to accomplish their fraudulent scheme.

130. As a direct and proximate result of Malibu's and Mr. Springer's misrepresentations and omissions, Mr. Borisch has sustained millions of dollars in damages in an amount to be determined at trial.

<u>**COUNT II**</u>
**Negligent Misrepresentation – Malibu and Mr. Springer**

131. The allegations of paragraphs 1 through ___ of the Complaint are incorporated herein by reference.

132. To the extent that the trier of fact concludes that the misrepresentations made by Malibu and Mr. Springer were not purposeful or intentional, it should conclude that such

29

misrepresentations were negligent or grossly negligent. Therefore, Mr. Borisch makes the following allegations in the alternative.

133. Malibu and Mr. Springer negligently misrepresented to Mr. Borisch that its market data supported the massive increase in floor plan capacity that it had demanded starting in the summer of 2022 when, in fact, Malibu and Mr. Springer already knew or should have known there would be a significant downturn in sales and in the broader market, generally, in the coming year.

134. Malibu and Mr. Springer negligently misrepresented and/or mischaracterized the data and other information known to them at the time in order to induce Mr. Borisch to acquiesce to its demand to increase Tommy's floor plan capacity.

135. Although Defendants knew or should have known that their misrepresentations to Mr. Borisch regarding market conditions and consumer demand were false when made, Defendants never disclosed the truth to Mr. Borisch, even as consumer demand continued to decline.

136. Given the Parties' prior course of dealing in which Malibu and Tommy's had worked together as partners and in good faith, Mr. Borisch reasonably relied upon Malibu's and Mr. Springer's misrepresentations, omissions, and/or mischaracterizations of their analysis and their data when he agreed to facilitate an increase in Tommy's floor plan capacity.

137. Malibu and Mr. Springer also negligently misrepresented to Mr. Borisch that they believed that Tommy's needed the volume and inventory mix that Malibu was forcing Tommy's to accept in order to meet sales and market share goals, rather than the volume and inventory mix that Mr. Borisch and his team at Tommy's had repeatedly requested that Malibu provide.

138. Malibu and Mr. Springer knew or should have known, at the time Malibu was forcing Tommy's to accept an unreasonably high volume of inventory and an inventory mix that

was heavily skewed towards higher-end and harder-to-sell boats, that it would be difficult if not impossible for Tommy's to sell those boats, given prevailing market conditions.

139.    Given the Parties' prior course of dealing in which Malibu and Tommy's had worked together as partners and in good faith, Mr. Borisch reasonably relied upon the misrepresentations made by Malibu and Mr. Springer regarding the appropriate volume and inventory mix when he gave in and agreed to accept the volume and inventory mix that Malibu was demanding that Tommy's accept.

140.    Between May and September 2023, Malibu and Mr. Springer negligently misrepresented to Mr. Borisch (and Tommy's), on numerous occasions, that: (1) Malibu was honoring its prior agreements and adhering to the Parties' customs and practices relating to rebates, incentives, and interest recoupment payments; (2) Malibu would enter into new dealership agreements for the 2024 fiscal year; and (3) Malibu would enter into a repurchase agreement with M&T Bank, notwithstanding the fact that it had not done so as of the time that the floor plan agreement went into effect.  Those representations were false, and the Defendants knew or should have known that they were false when they were made.  Defendants never intended to take those actions, as doing so would undermine their fraudulent scheme to inflate Sales and pass off losses caused by declining demand to Tommy's.

141.    Given the Parties' prior course of dealing, Mr. Borisch reasonably relied upon these misrepresentations to his detriment in several respects.  First, Mr. Borisch agreed to seek a larger floor plan agreement of more than $100 million, consistent with Malibu's prior demands.  Second, in order to facilitate the finalizing of that agreement with M&T Bank, Mr. Borisch signed a personal guarantee relating to the floor plan agreement.  Third, Mr. Borisch continued to accept inventory the dealerships ultimately could not sell and that Malibu knew the dealerships did not

need, including more than $25 million in new inventory over the months of May and June 2023. Mr. Borisch would not have agreed to any of those actions but for Malibu's and Mr. Springer's misrepresentations, as described.

142.  Malibu continued to make the same misrepresentations over the following months, as it continued to string Tommy's along through the summer of 2023.  During that period of time, Malibu continued to pump inventory into Tommy's, but continued to delay in entering into dealership agreements, continued to withhold the incentive, rebate, and interest recoupment payments that were owed, and continued to refuse to sign a repurchase agreement with M&T. However, Mr. Springer and Malibu continued to assure Mr. Borisch that it intended to take these actions and "make it right."

143.  Based upon those false assurances and the Defendants' other misrepresentations, as described, Mr. Borisch personally provided or guaranteed $29 million in additional funds over the following five (5) months, in order to keep Tommy's operating.  Had Mr. Borisch known that Malibu and Mr. Springer did not intend to enter into dealership agreements, sign the repurchase agreement, or pay the incentives, rebates, or interest recoupment payments owed, Mr. Borisch would not have continued to pour his own money into Tommy's during that period of time.

144.  During the same period of time, Malibu also negligently made false representations and promises of additional incentives that could be earned based upon sales when, upon information and belief, it had no intention of making such incentives payments.

145.  Mr. Borisch reasonably and justifiably relied on all of the referenced misrepresentations and omissions made by Malibu and by Mr. Springer.

146.  Malibu and Mr. Springer knew or should have known that Mr. Borisch would rely upon the referenced false assurances and misrepresentations.

147.     Malibu and Mr. Springer intended and desired for Mr. Borisch to rely upon the referenced false assurances and misrepresentations, because they intended to use Mr. Borisch and Tommy's to accomplish their fraudulent scheme.

148.     As a direct and proximate result of Malibu's and Mr. Springer's misrepresentations, Mr. Borisch has sustained millions of dollars in damages in an amount to be determined at trial.

149.     Malibu and Mr. Springer actively concealed their misrepresentations and material omissions, as well as their intentions with respect Mr. Borisch and his dealerships, up to and through March 2024.    Mr. Borisch did not discover that the Defendants' material misrepresentations were, in fact, false until that time.

**Count III**
**Breach of Implied Contract – Malibu**

150.     The allegations of paragraphs 1 through ___ of the Complaint are incorporated herein by reference.

151.     An implied contract was created between Malibu and Mr. Borisch when Malibu repeatedly assured Mr. Borisch that it would engage in certain actions that would enable Tommy's to recover financially, in exchange for Mr. Borisch's commitment to facilitate and/or personally fund the payment or repayment of certain debts owed by Tommy's, and in order to keep Tommy's in operation through early 2024.

152.     Specifically, Malibu repeatedly assured and represented to Mr. Borisch that it would: (1) honor its prior agreements and adhere to the Parties' customs and practices relating to rebates, incentives, and interest recoupment payments; (2) Malibu would enter into new dealership agreements for the 2024 fiscal year; and (3) Malibu would enter into a repurchase agreement with M&T Bank, notwithstanding the fact that it had not done so as of the time that the floor plan agreement went into effect.

153.     Malibu made those assurances in order to induce Mr. Borisch to: (1) facilitate a floor plan agreement with the capacity that Malibu had demanded, which was only possible through a personal guarantee from Mr. Borisch; (2) pay down the interest owed to M&T and boats sold out of trust in September 2023, so as to avoid violations, by Tommy's, of the terms of its agreements with M&T Bank, which required Mr. Borisch to personally provide and/or guarantee millions of dollars; and (3) continue to personally inject millions of dollars into Tommy's in order to keep it operating through early 2024.

154.     Malibu intended that Mr. Borisch engage in each of the referenced actions, based upon its assurances and representations, as described.  Mr. Borisch, based upon and in reliance upon Malibu's assurances and representations, did, in fact, personally guarantee the floor plan agreement with M&T Bank, and personally contributed or arranged for approximately $29 million in funding for Tommy's to keep the business afloat between September 2023 and February 2024.

155.     The referenced assurances and representations by Malibu and the resulting actions by Mr. Borisch constituted an implied contract between Malibu and Mr. Borisch.

156.     Malibu accepted and received the benefits of Mr. Borisch's actions, which enabled Malibu to unload an enormous and unreasonable volume of boats onto Tommy's, and to increase its own sales figures at a time when the rest of the market was struggling.  Malibu received those benefits as a direct result of Mr. Borisch's actions, as described in this Count.

157.     Malibu materially breached its implied contract with Borisch by:

a.     making material misrepresentations to Mr. Borisch regarding its understanding of the relevant market conditions and regarding its expectations regarding the market for its boats, as well as the anticipated sales figures for its boats during the relevant period;

34

b.      "intentionally pumping Tommy's full of inventory" in order to artificially inflate Malibu sales and market share;

c.      forcing Tommy's to accept the model mix of boats heavily skewed toward the Malibu brand (as opposed to the Axis brand that Tommy's had ordered and Malibu agreed to deliver);

d.      refusing to honor its commitment and obligation to repurchase the unsold inventory that it had forced Tommy's to accept and refusing to pay Tommy's millions of dollars in incentives earned, which effectively forced Tommy's into default with its floor plan lender; and

e.      refusing to enter into new dealership agreements with Tommy's based upon the lender issues that Malibu had orchestrated and caused.

158.    It would be inequitable and unjust for Malibu to retain the benefits it received as a result of Mr. Borisch's financial contributions and commitments, as described.

## COUNT IV
### Unjust Enrichment – Malibu and Mr. Springer

159.    The allegations of paragraphs 1 through ___ of the Complaint are incorporated herein by reference.

160.    In providing and arranging for the funding for Tommy's expansion of its floor plan capacity, Mr. Borisch provided a valuable benefit to Malibu, which allowed Malibu to inflate its purported sales figures, thereby driving up its profits and stock price.

161.    In providing or arranging for approximately $29 million to be provided to Tommy's between September 2023 and February 2024, Mr. Borisch enabled Tommy's to avoid violating its agreements with M&T Bank and to stay in operation.  In turn, Malibu continued to benefit from Tommy's continued operation, both through further sales and through its provision of additional

35

inventory to Tommy's.

162.　Malibu induced Mr. Borisch into providing and arranging for the funding for Tommy's expansion of its floor plan capacity and to keep Tommy's in business and operating between the summer of 2023 and early 2024, as described herein.

163.　Malibu accepted and received the benefits of Mr. Borisch's efforts.

164.　In addition, Mr. Springer benefitted, personally, through compensation, bonuses, severance, or other benefits that were derivative of the "sales" to Tommy's that resulted from the Defendants' scheme, as described herein.

165.　Mr. Borisch has not been compensated for and has not received reimbursement for the amounts he invested and guaranteed at Malibu's direction and behest, or for the resulting benefit that his efforts conferred on Malibu.

166.　It would be inequitable and unjust for Malibu to retain the benefit that Mr. Borisch provided without paying compensation for the benefits it received.　Further, Malibu should be forced to disgorge any all profits it obtained as a result of its misconduct as described herein.

WHEREFORE, PLAINTIFF DEMANDS:

1.　That proper process be issued and served upon the Defendants and that they be required to appear and answer this Complaint within the time prescribed by law;

2.　That Mr. Borisch be awarded a judgment against the Defendants in an amount sufficient to compensate him for the damages he has suffered;

3.　That Mr. Borisch be granted all other available remedies in equity, including disgorgement of the amount by which Defendants have been unjustly enriched;

4.　That Mr. Borisch also be awarded a judgment against the Defendants for punitive damages in an amount sufficient to punish the Defendants for their misconduct and to deter the

36

Defendants and others from similar misconduct in the future;

5.      That Mr. Borisch be awarded pre-judgment and post-judgment interest on the damages he has suffered at the highest lawful rates;

6.      That the costs of this action be awarded to Mr. Borisch;

7.      That Mr. Borisch be awarded such alternative and/or additional relief as the equities and justice may require; and

8.      That a jury be empaneled to try this cause.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By:     */s/ Philip N. Elbert*
        Philip N. Elbert, # 9430
        J. Isaac Sanders, # 29372
        Nathan C. Sanders, # 33520
        Jeffrey A. Zager, # 32451
        Elizabeth C. Tirrill #41346
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713 – Telephone
(615) 726-0573 – Facsimile
pelbert@nealharwell.com
isanders@nealharwell.com
nsanders@nealharwell.com
jzager@nealharwell.com
etirrill@nealharwell.com
*Counsel for Plaintiff Matthew Allen Borisch*

## CERTIFICATE OF SERVICE

I certify that on August 16, 2024, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

*/s/ Philip N. Elbert*